**SAVAGE, SHARKEY, REISER & SZULBORSKI EYE CARE CONSULTANTS, P.C., Appellant**

v.

**Jay B. TANNER, O.D., Appellee.**

Superior Court of Pennsylvania.

Argued Nov. 18, 2003.
Filed April 15, 2004.

Robert D. Schaub, Wilkes-Barre, for appellant.

John C. Aciukewicz, Wilkes-Barre, for appellee.

Before: TODD, BENDER and BECK, JJ.

BENDER, J.:

¶ 1 Savage, Sharkey, Reiser & Szulborski Eye Care Consultants, P.C. (Eye Care) appeals from the order granting summary judgment in favor of Jay B. Tanner, O.D., in Eye Care's action in equity against Dr. Tanner that sought to compel his compliance with a covenant not to compete. Eye Care has raised several allegations of error, all of which we find to be without merit, and therefore we affirm.

¶ 2 The trial court did not write an opinion in this case; however, the record shows the following undisputed facts. Dr. Tanner entered into an employment agreement with Joseph F. Pugliese, M.D., d/b/a, The Pugliese Eye Specialists, on November 23, 1987. On January 1, 1996, Dr. Tanner and Pugliese entered into a second employment agreement, the term of which expired on June 30, 1999. The agreement also provided that after its expiration, it would automatically renew for successive 12-month periods unless otherwise terminated by either party pursuant to the agreement's provisions.

¶ 3 In February of 1998, Eye Care purchased Pugliese Eye Specialists. After the purchase, Dr. Tanner was employed by Eye Care, and began receiving his paychecks from Eye Care. Although Eye Care had several offices, Dr. Tanner continued working at the same office location at which he worked during his employment with Pugliese. On or about the date of the sale transaction, Eye Care's CEO, Mark Kelly, executed a document entitled "Assumption of Assignment," dated February 12, 1998, in which Eye Care agreed "to be bound to Employee by all the terms and obligations of the Employer" under the "Employment Agreement." Although the Assumption of Assignment stated that the

Employment Agreement being assigned was with Pugliese as the "Employer," it contained no term identifying the "Employee."

¶ 4 However, the execution of the Assumption of Assignment was consistent with a provision in Dr. Tanner's employment agreement, which stated:

29. *Assignment.* Neither this Agreement nor any right or interest or obligation hereunder shall be assignable by Employee, his beneficiaries, or legal representatives without Employer's prior written consent. Employer may assign his rights and obligations under this Agreement to any legal entity or individual that acquires or otherwise continues the business currently conducted by Employer, and upon such assignment and the delivery to Employee of the written agreement of such assignee to be bound by all of the terms and obligations of the Employer under this Agreement, Employer shall be released of all obligations under this Agreement and the term "Employer" shall thereafter refer to such assignee as though assignee had originally been the Employer under this Agreement.

Employment Agreement, 1/1/96, ¶ 29. Although the foregoing provision states that the term "Employer" shall refer to the assignee only after a "written agreement of such assignee to be bound by all of the terms and obligations of the Employer under this Agreement" is *delivered to the Employee,* it is not disputed that Eye Care did not deliver the Assumption of Assignment to Dr. Tanner at the time of its purchase of Pugliese Eye Specialists.

¶ 5 On March 26, 2000, Dr. Tanner decided to resign from his job with Eye Care, and he gave it notice that his last day of employment would be in two weeks. In response, Eye Care's CEO, Mr. Kelly, wrote Dr. Tanner a letter, dated March 27,

2000, stating that Dr. Tanner was contractually obligated to them under the terms of the employment agreement entered into between Dr. Tanner and Pugliese Eye Specialists and that under the agreement, Dr. Tanner was bound by a covenant not to compete that stated the following:

12.01 *Covenant Not to Compete.* Upon termination of Employee's employment, regardless of the reason therefor and whether termination occurs by Employer or Employee, or upon the expiration of any term or extension of any term of employment under this Agreement, Employee agrees that he shall not for a period of two years thereafter, directly or indirectly, practice optometry or engage, assist, or have any direct or indirect interest in or in connection with, any person, corporation or professional business entity that is, or is about to become, directly or indirectly, engaged in the practice of optometry within a radius of fifteen (15) miles from any then existing office of Employer at which Employee has performed services on a regular basis as scheduled by Employer; provided, however, that for the foregoing two-year period, Employee shall not represent, within a fifteen (15) mile radius of any then existing office of Employer, to any third party that he has been employed by or otherwise associated with Employer. As used in this Paragraph 12, the phrase "direct or indirect" shall include Employee's activities as an employee, owner, partner, agent, director, officer, shareholder, consultant or in any other capacity.

Employment Agreement, 1/1/96, ¶ 12.01. In addition to asserting that Dr. Tanner was bound by the agreement, Mr. Kelly also attached the Assumption of Assignment, dated February 12, 1998, to his letter to Dr. Tanner. In its brief, Eye Care concedes that it did not deliver the As-

sumption of Assignment until March 27, 2000, and that it only did so "[u]pon learning of TANNER's intention to breach the EMPLOYMENT AGREEMENT." Appellant's Brief at 17–18. Thus, Eye Care did not deliver the Assumption of Assignment to Dr. Tanner until over two years after Eye Care purchased Pugliese's practice.

¶ 6 Notwithstanding Eye Care's attempt to enforce the employment agreement, Dr. Tanner left Eye Care and began working for one of its competitors within the geographic limits of the covenant not to compete. Dr. Tanner began his new employment sometime in May of 2000. Eye Care took no action at first, but in August of 2001, it filed a complaint in equity against Dr. Tanner sounding mainly in breach of contract in which it sought, *inter alia,* specific performance by means of a judgment that would enjoin Dr. Tanner from violating the covenant not to compete. Dr. Tanner filed a motion for summary judgment, which the court granted. Eye Care then brought this appeal raising four questions for our review:

I. WHETHER THE TRIAL COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SINCE THE EMPLOYMENT AGREEMENT HAD AN ASSIGNABILITY PROVISION, MAKING THE RESTRICTIVE COVENANT NOT TO COMPETE ENFORCEABLE.

II. WHETHER THE TRIAL COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT SINCE THE EMPLOYMENT AGREEMENT HAD AN ASSIGNABILITY PROVISION, AND DELIVERY OF THE ASSUMPTION OF ASSIGNMENT TO THE EMPLOYEE WAS NOT A PREREQUISITE TO THE EMPLOYER'S/ASSIGNEE'S RIGHT TO ENFORCE THE EMPLOYMENT AGREEMENT.

III. WHETHER THE TRIAL COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BECAUSE THE EMPLOYER DID DELIVER THE ASSUMPTION OF ASSIGNMENT PRIOR TO EMPLOYEE'S TERMINATION DATE.

IV. WHETHER THE TRIAL COURT ERRED IN GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT WHEN THE EMPLOYMENT AGREEMENT HAD A VALID COVENANT NOT TO COMPETE.

Appellant's Brief at 4.

¶ 7 "We begin by noting this court will only reverse the trial court's entry of summary judgment where there was an abuse of discretion or an error of law.... An appellate court applies the same standard for summary judgment as the trial court." *Donegal Mut. Ins. Co. v. Fackler,* 835 A.2d 712, 715 (Pa.Super.2003) (citations and quotation marks omitted).

Summary judgment is proper when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits demonstrate that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. In determining whether to grant summary judgment a trial court must resolve all doubts against the moving party and examine the record in a light most favorable to the non-moving party. Summary judgment may only be granted in cases where it is clear and free from doubt the moving party is entitled to judgment as a matter of law.

*Sebelin v. Yamaha Motor Corp.*, 705 A.2d 904, 907 (Pa.Super.1998) (citations omitted). Furthermore, as we are here reviewing the decision of a court sitting in equity, we are mindful of the following standard of review:

> The function of this Court on an appeal from an adjudication in equity is not to substitute its view for that of the lower tribunal; our task is rather to determine whether 'a judicial mind, on due consideration of all the evidence, as a whole, could reasonably have reached the conclusion of that tribunal.'

*Hess v. Gebhard & Co., Inc.*, 570 Pa. 148, 808 A.2d 912, 920 (2002) (quoting *Aiken Indus., Inc. v. Estate of Wilson*, 477 Pa. 34, 383 A.2d 808, 810 (1978)).

■ ¶ 8 In the first question presented for our review, Eye Care claims that the trial court erred in granting summary judgment because Dr. Tanner's employment agreement with Pugliese had a valid assignment provision that made the covenant not to compete enforceable by Eye Care. In *Hess*, our Supreme Court addressed the assignability of covenants not to compete, where it stated:

> [W]e are persuaded that the better rule in deciding whether restrictive covenants are assignable is that the employment contract, of which the covenant is a part, is personal to the performance of both the employer and the employee, the touchstone of which is the trust that each has in the other. The fact that an individual may have confidence in the character and personality of one employer does not mean that the employee would be willing to suffer a restraint on his employment for the benefit of a stranger to the original undertaking. **Therefore, we hold that a restrictive covenant not to compete, contained in an employment agreement, is not assignable to the purchasing business entity, in the absence of a specific assignability provision, where the covenant is included in a sale of assets.** In reaching this conclusion, we find that personal characteristics of the employment contract permeate the entire transaction. Like the contract for hire, upon which the covenant was given, the employee's restrictive covenant is confined to the employer with whom the agreement was made, absent specific provisions for assignability.

*Hess*, 808 A.2d at 922 (emphasis added). The foregoing makes clear that if an employment contract contains an assignability provision, then a covenant not to compete within that contract may be assigned to a purchaser in a transaction for the sale of assets. In this case, Eye Care purchased Pugliese's practice, part of which was an employment agreement between Pugliese and Dr. Tanner that contained an assignability provision. Consequently, Dr. Tanner's employment agreement, which contained the covenant not to compete, was assignable to Eye Care as the purchaser of Pugliese's practice.

■ ¶ 9 This conclusion does not resolve this appeal, however, as we must next determine whether Eye Care met its duty as the assignee of the employment agreement between Pugliese and Dr. Tanner. In this regard, and as part of its argument in its first question, Eye Care claims that Dr. Tanner was not "entitled to delivery of written notice of the assignment." Appellant's Brief at 12. This argument also embodies the entirety of Eye Care's second question presented for our review, for which Eye Care has presented less than one page of argument. Appellant's Brief at 16. Thus, the remainder of our analysis of Eye Care's first question shall also dispose of its second question.

¶ 10 The point of contention between Eye Care and Dr. Tanner on the issue of

delivery arises from the language in the assignability provision that states:

> [U]pon such assignment and the delivery to Employee of the written agreement of such assignee to be bound by all of the terms and obligations of the Employer under this Agreement, **Employer shall be released of all obligations under this Agreement and the term "Employer" shall thereafter refer to such assignee as though assignee had originally been the Employer under this Agreement.**

Employment Agreement, 1/1/96, ¶ 29 (emphasis added). Eye Care claims that delivery of the written agreement of its obligation to be bound by the terms of the employment agreement to Dr. Tanner "only operates to release Employer, Dr. Pugliese, from all of his obligations under the Agreement." Appellant's Brief at 12. Conversely, Dr. Tanner claims that pursuant to the express language of the provision, "until delivery to the employee of the successor[']s agreement to be bound, the term 'employer' shall refer to the predecessor employer and not to the successor employer." Brief for Appellee at 3.

¶ 11 We conclude that Eye Care's interpretation would render part of the assignability provision's language superfluous. The provision clearly states that the term "Employer" shall only refer to the assignee after the written agreement of the assignee to be bound by the terms of the employment agreement is delivered to the "Employee." In this case, the written agreement of the assignee to be bound by the terms of the employment agreement was the Assumption of Assignment that was executed by Eye Care's CEO in February of 1998. Therefore, pursuant to the assignability provision, Eye Care would not become Dr. Tanner's "Employer" under the terms of the employment agree-

ment until it delivered the Assumption of Assignment to Dr. Tanner.

¶ 12 However, under Eye Care's interpretation, it would be permitted to step into the role of "Employer" without ever having delivered the Assumption of Assignment to Dr. Tanner. But until Dr. Tanner received the Assumption of Assignment from Eye Care, he had no document to bind Eye Care to the terms of his employment agreement because the term "Employer" in his employment agreement continued to refer to Pugliese. It is only after delivery that the term "Employer" would refer to Eye Care. Thus, Eye Care seeks to reserve unto itself the right to invoke the employment agreement while depriving Dr. Tanner of any ability to do the same.

¶ 13 The fallacy in Eye Care's interpretation is further demonstrated by its own argument, wherein it states:

> In the absence of any delivery to Tanner, Dr. Pugliese retained all *rights* **and** obligations under the EMPLOYMENT AGREEMENT, and EYE CARE's acquisition and assumption of Dr. Pugliese's practice and business simply added Eye Care as an additional "legal entity" which assumed and enforced the rights and obligations of the EMPLOYMENT AGREEMENT.

Appellant's Brief at 16. This argument is baseless. It is completely unfounded to assert that Pugliese "retained" all rights and obligations, and to concomitantly state that Eye Care acquired those same rights and obligations. The assignability provision does not contemplate the existence of two employers existing simultaneously, either of which could enforce Dr. Tanner's obligations under the contract. Rather, the provision permits the "Employer" to "assign his rights and obligations under this Agreement to any legal entity or individual that acquires or otherwise continues

the business," and that after the execution of the assignment, including delivery of the assignee's agreement to be bound, the assignee would then become the "Employer." The process of assignment entails one party being substituted for another as the "Employer" under the employment agreement; it does not envision the existence of two employers. Eye Care's claim to the contrary is groundless. Therefore, we conclude that in order for there to have been a valid assignment Eye Care must have delivered the Assumption of Assignment.

■ ¶ 14 There is one final issue raised by Eye Care in its first question that we must address. Eye Care claims that because Dr. Tanner "continued to work for EYE CARE, the successor employer, for over two years, accepting paychecks from them and not objecting to the change of owners" he somehow "ratified" the assignment. Appellant's Brief at 14–16. In so claiming, Eye Care relies on *Alabama Binder & Chemical Corp. v. Pennsylvania Industrial Chemical Corp.*, 410 Pa. 214, 189 A.2d 180 (1963), a case in which our Supreme Court considered the propriety of a preliminary injunction to enforce a restrictive covenant in an employment contract. The Court noted that in reviewing an appeal from a grant of a preliminary injunction, its scope of review is narrow, and is limited to a review of the record to determine whether " 'there were any *apparently reasonable grounds* for the action of the court below, and we will not further consider the merits of the case or pass upon the reasons for or against such action, unless it is plain that no such grounds existed or that the rules of law relied on are palpably wrong or clearly inapplicable.' " *Id.* at 181 (quoting *Lindenfelser v. Lindenfelser*, 385 Pa. 342, 123 A.2d 626, 627 (1956) (emphasis added in *Alabama*)).

¶ 15 The Court went on to review the determination of the trial court, and in particular, whether the successor employer, New Alabama, had standing to enforce a covenant not to compete that was contained within the employee's contract with his previous employer. In pertinent part, the Court stated the following:

And finally, the [trial] court held that New Alabama had standing to enforce these agreements despite appellants' contention that these agreements were non-assignable personal service contracts. It cited several cases supporting the proposition that 'restrictive covenants not to compete are just as assignable as any other asset of the employer's business. Moreover, it held that even in the absence of assignability, New Alabama has standing to enforce the contract since [employee] had ratified the assignment of his contract when he knowingly continued to work for the new corporation under the same contract he had with the old corporation.

**Without passing judgment on the merits of these questions**, we conclude that under the standard of review set forth in *Lindenfelser v. Lindenfelser, supra*, the court below had *apparently reasonable grounds* for its action, especially in view of the fact that the restrictive covenant was made in conjunction with a buy-sell agreement.

*Id.* at 183–84 (first emphasis added) (quotation marks omitted). The Court affirmed the trial court's grant of a preliminary injunction, but the foregoing shows that its determination did not include a ruling on the merits of the trial court's analysis, but instead only concluded that there were apparently reasonable grounds for its decision.

¶ 16 In its brief, Eye Care quotes only that part of the foregoing language that discussed ratification. It claims that the

"Supreme Court agreed with the trial court" that the employee ratified the assignment by continuing to work for the new corporation. Appellant's Brief at 15. This is a misreading of the case. As stated by the Court itself, it reached its decision "without passing judgment on the merits" of whether the employee ratified the assignment. *Alabama*, 189 A.2d at 184. Consequently, the case lends no support to Eye Care's argument.

■ ¶ 17 Furthermore, we conclude that Dr. Tanner's continued employment under Eye Care did not obviate the requirement that Eye Care deliver the Assumption of Assignment to Dr. Tanner in order to effectuate a valid assignment. It must be remembered that in Pennsylvania, employment is at-will and " '[a]bsent a statutory or contractual provision to the contrary, the law has taken for granted the power of either party to terminate an employment relationship for any or no reason.' " *Shick v. Shirey*, 552 Pa. 590, 716 A.2d 1231, 1233 (1998) (quoting *Geary v. U.S. Steel Corp.*, 456 Pa. 171, 319 A.2d 174, 176 (1974)). Thus, Dr. Tanner's continued employment for Eye Care in the absence of an employment agreement between himself and Eye Care is of no consequence.

¶ 18 We next address the issue raised in Eye Care's third question, namely, that it delivered the Assumption of Assignment to Dr. Tanner on March 27, 2000, which was prior to his last day of employment on April 6, 2000. Eye Care claims that this delivery "required that Eye Care would thereafter be referred to as the 'Employer' with all the rights and obligations under the EMPLOYMENT AGREEMENT with TANNER." Appellant's Brief at 17.

¶ 19 Eye Care purchased Pugliese's practice in February of 1998. Dr. Tanner submitted his resignation from Eye Care on March 26, 2000. Despite having executed the Assumption of Assignment on February 12, 1998, Eye Care did not deliver it to Dr. Tanner for over two years. Such dilatory conduct on the part of Eye Care may in and of itself be sufficient to have rendered such delivery a nullity. However, not only did it wait over two years to deliver the Assumption of Assignment, it finally delivered it to Dr. Tanner only after he submitted his resignation. Although he gave Eye Care two weeks' notice of his last day of work, he unequivocally resigned on March 26, 2000.

¶ 20 As stated above, were we to sanction Eye Care's conduct, we would be permitting it to reserve unto itself a unilateral right to enforce the employment agreement by withholding delivery of the Assumption of Assignment for over two years because during this time, Dr. Tanner was not in possession of any document that bound Eye Care to the obligations of the "Employer" under his employment agreement with Pugliese. This is fundamentally unfair.

■ ¶ 21 However, one seeking equitable relief must act fairly in order to be entitled to such relief.

> Our Supreme Court has stated, 'A court may deprive a party of equitable relief where, to the detriment of the other party, the party applying for such relief is guilty of bad conduct relating to the matter at issue. **The doctrine of unclean hands requires that one seeking equity act fairly** and without fraud or deceit as to the controversy in issue.'

*In re Estate of Scharlach*, 809 A.2d 376, 383 (Pa.Super.2002) (emphasis added) (quoting *Terraciano v. Commonwealth Dept. of Transp.*, 562 Pa. 60, 753 A.2d 233, 238 (2000)). In this case, Eye Care's actions, unintentional or otherwise, were unfair to Dr. Tanner and were detrimental to his employment interests, as they deprived him of the right to an enforceable employ-

ment agreement with Eye Care for over two years. Eye Care's conduct was also detrimental to Dr. Tanner's interests because it did not deliver the Assumption of Assignment until after he resigned. One cannot expect that Dr. Tanner was on the same footing in his employment with Eye Care before and after he notified them of his resignation. Clearly, he would be in an undesirable situation were he compelled to continue working for Eye Care after giving it notice of his desire to cease working for it. Accordingly, we conclude that Eye Care's delivery of the Assumption of Assignment to Dr. Tanner over two years after it purchased Pugliese's practice was ineffective in perfecting the assignment of the employment agreement.

¶ 22 Having determined that Eye Care failed to effectuate a valid assignment of the employment agreement between Pugliese and Dr. Tanner, it follows that the covenant not to compete contained within the agreement is unenforceable. This resolution is dispositive of the remaining issues raised by Eye Care in this appeal.

¶ 23 Order **AFFIRMED**.