**Jackson Township v. Dizzy Dottie, LLC**

C.P. of Monroe County, no. 4487 CIVIL 2010.

*John B. Dunn* and *Ralph A. Matergia*, for plaintiff.
*Ira E. Weiner*, for defendant.

VICAN, *P.J.*, October 19, 2010—On June 25, 2010, defendant, Dizzy Dottie, LLC (hereafter "defendant") filed a demand for final hearing pursuant to Pa. R.C.P. No. 1531(f)(1) in connection with the preliminary injunction issued on June 16, 2010[1]; however, defendant failed to serve a copy of the demand upon the court. As noted in our June 30, 2010 order, we did not become aware of the demand for final hearing until June 29, 2010, when we received a copy of plaintiff's opposition to defendant/respondent's demand for final hearing. Although we do not agree with defendant that the issue(s) in this case involves freedom of expression, we nevertheless granted appellant's request for a final hearing and scheduled same for the first available date on the court's calendar. The final hearing began on July 6, 2010 and concluded on September 16, 2010.[2] On July 20, 2010, plaintiff/petitioner Jackson Township (hereafter "plaintiff") filed a petition to enjoin or abate violations of 68 Pa. C.S.A. § 5503(b) & (d). Upon review of the petition and after

---

1. On July 9, 2010, defendant appealed the June 16, 2010 order granting preliminary injunction, as well as the June 30, 2010 order continuing the preliminary injunction, to the Superior Court. The Superior Court transferred the appeals to the Commonwealth Court on or about August 18, 2010. The appeals are still pending in the Commonwealth Court.

2. Due to the extensive evidence presented by defendant, the final hearing has taken place over a period of five days over the past three months (July 6, August 18, August 20, August 31 and September 16, 2010).

consideration of the testimony previously presented, we concluded that violations of 58 Pa. C.S.A. § 5503(b) & (d) had occurred and, therefore, entered an order temporarily enjoining defendant from "continuing or permitting the continuation of any violation of chapter 55" Specifically, the order temporarily enjoined defendant from "permitting or allowing live adult entertainment in booths, cubicles, rooms or stalls, which are blocked or obscured by doors, curtains, partitions, drapes, or any other obstruction whatsoever, and which is not continuously open to viewing in its entirety from the common areas of the premises." [Order, 7/28/10.] The matter was scheduled for the next hearing date on August 18, 2010.

Although the final hearing had not yet concluded, defendant filed an answer to complaint and new matters on August 10, 2010. On August 20, 2010, plaintiff filed a petition for supplemental preliminary injunctive relief and defendant filed an answer on August 24, 2010. Plaintiff filed a reply to new matter on August 30, 2010. The petition was scheduled to be heard at the next date set for final hearing, August 31, 2010. Defendant filed a motion for post hearing relief on August 31, 2010. The conclusion of the final evidentiary hearing occurred on September 16, 2010.[3] The parties filed their respective briefs on September 27, 2010. We are now ready to dispose of this matter.

## DISCUSSION

We have several matters pending before the court at this time. In addition to its request for a permanent injunction,

---

3. Defendant waived the 24-hour/5-day time periods within which the court is to make a decision pursuant to Pa. R.C.P. 1531(f)(1).

plaintiff has filed a petition to enjoin or abate violations of 68 Pa. C.S.A. § 5503(b) & (d), as well as a petition for supplemental preliminary injunctive relief. Inasmuch as our decision with respect to plaintiff's request for a permanent injunction will affect our ruling on these two petitions, we will address them at the conclusion of our discussion regarding plaintiff's request for permanent injunctive relief.

"In order to establish a claim for a permanent injunction, the party must establish his or her clear right to relief." *J.C. Ehrlich Co., Inc. v. Martin*, 979 A.2d 862, 864 (Pa. Super. 2009), citing *Pestco, Inc. v. Associated Products, Inc.*, 880 A.2d 700, 710 (Pa. Super. 2005) (citation omitted). "...[U]nlike a claim for a preliminary injunction, the party need not establish either irreparable harm or immediate relief and a court may issue a final injunction if such relief is necessary to prevent a legal wrong for which there is no adequate redress at law." *Id.*

### I. *The entertainment featured at Thrills constitutes "sexual conduct" and "sexually explicit nudity" which brings the business squarely within the jurisdiction of Zoning Ordinance 97-100.*

Plaintiff contends that the business known as "Thrills" located at the corner of Route 715 and Doll Road in Reeders, Jackson Township, Monroe County, Pennsylvania, is still operating as an "adult cabaret" in violation of Jackson Township Zoning Ordinance 97-100 despite this court's issuance of a preliminary injunction on June 16, 2010. We agree, but before reaching a conclusion as to whether Jackson Township is entitled to permanent injunctive relief against defendant, we feel that we must clarify the definition of an "adult cabaret" and determine, based on new evidence

presented during the final hearing, whether Thrills is operating as an adult cabaret.

In our prior opinion of June 16, 2010, we found that Thrills is an establishment, club, tavern, restaurant, theatre hall or room that is open to the general public and it offers live entertainment to its patrons. Consequently, we concluded that Thrills is an adult cabaret as that term is defined in the zoning ordinance. Since that time we have received additional evidence that may or may not change this finding.

While defendant denies that the entertainment at Thrills "features" erotic dancing by female dancers who are in various stages of dress and/or undress, defendant admits that it "permits" live adult entertainment to take place in its establishment. Therefore, before we review the abundance of evidence presented by the private investigators hired by plaintiff, we believe it would be prudent to define some of the terms found in the ordinance.

First, the definition of an adult cabaret under Ordinance 97-100 refers to: "an establishment, club, tavern, restaurant, theatre hall or room which *features* live entertainment distinguished or characterized by emphasis on *sexual conduct, sexually explicit nudity* and/or activities such as mud wrestling and dancing." [Plaintiff's exhibit 4-Jackson Township Zoning Ordinance No. 97-100, adopted 2/13/97 (emphasis added).] Using common, everyday definitions from an internet dictionary rather than from a statute, we define the highlighted terms as follows:

a) *feature* - (n) highlight, characteristic, trait; (v-1) include, present, introduce, highlight; (v-2) figure, appear, be included, star, play a part.

b) *permit* - (not from the ordinance, but defendant's term used to describe what the management of Thrills allows) (v) authorize, allow, consent, let, okay, sanction, give your blessing to; (n) license, certification, authorization.

c) *authorization* - (n) approval, agreement, sanction, permission, consent, endorsement.

The terms *feature, permit and authorization* can all be used to describe what the management at Thrills allows or expects from their dancers. First, the advertisements placed in the newspaper titled *Focus*, clearly show that Thrills' adult nightclub presents, introduces, highlights, and thus "features", live entertainment that includes lap dances and topless female dancers. [Plaintiff's exhibits 9, 12, 13, & 14—*focus* newspaper.] Likewise, a large billboard located adjacent to Route 33 in Hamilton Township indicates that Thrills "presents", "highlights", and/or "features" nude female dancers. The definition of "feature" also means to "play a part".

Defendant's counsel asserts that the VIP dances provide the male patrons with a fantasy. To create a fantasy, one must "play a part" in that fantasy and since the definition of the word "feature" also includes "play a part", it is not a far stretch to conclude that these so-called "fantasies" are "featured" entertainment. Based on the foregoing, we find that Thrills' management does in fact "feature" both topless and totally nude female dancers as part of its nightly live entertainment.

Another term from the ordinance definition of adult cabaret is the term *"sexually explicit nudity"*. To understand the plain meaning of this term, we must break it down and define each of the words individually. For instance, the

word *explicit* means open, clear, overt, plain, unambiguous, unequivocal; precise, exact, specific, definite; frank, uninhibited, candid, and graphic. Clearly, the actions of the dancers in appearing topless and/or totally nude are "open, clear, overt, uninhibited, candid, and graphic" acts. There can be no question that the dances are *"explicit."* But are they *"sexually explicit"*?

The word *sexual* means involving or relating to sex, i.e. sexual desire/feelings; concerning relationships between men and women, or the way that people think men and women should behave; (synonyms) erotic, fleshy, carnal, and sexy. The evidence in this case is clear - the female dancers at Thrills perform dances that are designed to elicit sexual desires/feelings in the male patrons. Defense counsel admits this. The dancers perform topless and nude, thus they are revealing flesh in an obviously sexy and carnal manner. The dances are also *erotic* which means they are intended to make you sexually excited, to create erotic thoughts. The dances are sexy, sensual, stimulating, and suggestive (also admitted by defense counsel).

In our June 16, 2010 opinion, we relied on Title 18, section 5903(b) of the Pennsylvania Consolidated Statutes for a definition of the term *"nude"*. *Nude* means the showing of "the human male or female genitals, pubic area or buttocks with less than a fully opaque covering, or showing the female breast with less than a fully opaque covering of any portion thereof below the top of the nipple." 18 Pa. C.S.A. § 5903(b). The testimony and video (plaintiff's exhibit #2, 5/19/10) presented by Glen Miller at the preliminary hearing, without a doubt, shows that Autumn performed for him "topless". Therefore, by the definition set forth above, Autumn was nude.

More significantly, the testimony of Brian Miller and William Cooperman clearly establishes that the female dancers perform topless on stage and a couple of the female dancers were completely nude when they performed lap dances for them in the VIP rooms.

Thus, when you apply the definitions of the terms *"sexual, explicit and nude"*, to the evidence presented through the testimony of the private investigators, Glen Miller, Brian Miller and William Cooperman, it is not a far stretch to conclude that the performances by the female dancers at Thrills do constitute *"sexually explicit nudity."*

Notably, the female dancers did not begin to perform totally nude until after the entry of the preliminary injunction on June 16, 2010. Defense counsel has mistakenly interpreted the preliminary injunction to mean that it does not preclude "nude" dancing at its establishment. This is not what the preliminary injunction said. The preliminary injunction merely stated that at the time of the first hearing, plaintiff had not satisfied its burden of proving that topless or nude dancing was actually taking place. In fact, the testimony of Glen Miller revealed that Thrills had not yet gone topless when he was there. It should be made clear that the preliminary injunction did not give Thrills the green light to go topless, nor did it give it a green light to go totally nude. For this reason, we find that Thrills is in violation of the preliminary injunction.

In conclusion and based on the foregoing, we adopt our findings from the preliminary hearing as set forth in our opinion dated June 16, 2010, and we reaffirm our previous ruling that "Thrills is an establishment, club, tavern, and restaurant which features live entertainment distinguished

or characterized by emphasis on sexual conduct, specifically that conduct which occurs during the VIP dances." [Opinion/Order, 6/16/10, p. 18.]

Finally, we must determine whether Jackson Township is entitled to a permanent injunction against defendant. Unlike its claim for a preliminary injunction, Jackson Township need not establish either irreparable harm or immediate relief in order to be entitled to a permanent injunction. It is within the power of this court to issue a final injunction if such relief is necessary to prevent a legal wrong for which there is no adequate redress at law. For the reasons stated above, we find that Jackson Township has met its burden of establishing a claim for permanent injunctive relief and that it has a clear right to that relief. *J.C. Ehrlich*, supra.

## II. *Zoning Ordinance 97-100 constitutes a valid time, place and manner restriction on adult facilities located within Jackson Township*

The Zoning Ordinance 97-100 prohibits the operation of adult cabarets within the borders of the commercial zoning district of Jackson Township. However, the zoning ordinance does provide that adult cabarets are permitted to operate within the borders of the industrial zoning district of Jackson Township. Jackson Township Zoning Ordinance 97-100 defines an adult facility as: "an establishment open to the general public or a private club opened to members which is used and occupied for one or more of the following activities:

(1) Adult book store...

(2) Adult theatre...

(3) Adult cabaret - an establishment, club, tavern,

restaurant, theatre hall or room which features live entertainment distinguished or characterized by emphasis on sexual conduct, sexually explicit nudity and/or activities such as mud wrestling and dancing.

(4) Adult massage parlor...

[Petitioner's exhibit #4-Jackson Township Zoning Ordinance 97-100, Sec. 1 (J)(1-4), adopted February 13, 1997.]

Section 2 of Chapter 27, sets forth certain criteria and isolation distances that must be followed by adult facilities to locate their business in the industrial zoning district.

Section 2: Chapter 27 section 801(2)(K) states as follows:

K. *Adult facilities* - any adult facilities or businesses as defined in section J, above, which contain an adult facilities section shall comply with the following requirements:

(1) An adult facility shall not be located within 1000 feet of any other adult facility.

(2) An adult facility shall not be permitted to be located within 1000 feet of any public or private school, day care facility, indoor or outdoor public recreation facility, or any religious house of worship.

(3) An adult facility shall not be permitted within 500 feet of a school bus stop regardless of the time of day when the school bus stops at that location.

(4) No materials, merchandise, film or service offered for sale, rent, lease, loan or for view shall be exhibited, displayed or graphically represented outside of a building

or structure.

(5) Any building or structure used and occupied as an adult facility shall be windowless or have an opaque covering over all windows or doors of any area in which materials, merchandise, film, service or entertainment are exhibited or displayed and no sale materials, merchandise, film or offered items of service or entertainment shall be visible from outside the structure.

(6) No sign shall be erected upon the premises depicting or giving a visual representation of the type of materials, merchandise, film, service or entertainment offered therein.

(7) If all adult facility videotape or laser disc rental users are restricted to a discreet small area of 150 feet or less within a larger non-adult facility business, then the requirement under (5) and (6) above only apply to that section of the business which is devoted to an adult facility videotape or laser disc rental use area within the business space.

[Plaintiff's exhibit #4-Zoning Ordinance 97-100, section 2.]

Defendant challenges Zoning Ordinance No. 97-100 by trying to establish that the ordinance "regulates expressive conduct similar to barroom nude dancing", 'and thus, "it is subject to first amendment analysis and restrictions." [Defendant's post final hearing memorandum of law, 9/27/10, p.3.] We disagree. It has always been plaintiff's and this court's position that the matter before us is simply a zoning issue and does not involve a constitution question. Nevertheless, we will briefly address the constitutionality of Ordinance 97-100 in order to put the matter to rest.

In *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 106 S. Ct. 925 (U.S. Sup. Ct. 1986), the court held that the zoning ordinance which prohibited adult motion picture theaters from locating within 1,000 feet of any residential zone, single or multiple-family dwelling, church, park or school "was a valid governmental response to the serious problems created by adult theaters and satisfied the dictates of the first amendment." (citation omitted). The *Renton* court went on to say:

> (a) Since the ordinance does not ban adult theaters altogether, it is properly analyzed as a form of time, place, and manner regulation. 'Content-neutral' time, place, and manner regulations are acceptable so long as they are designed to serve a substantial governmental interest and do not unreasonably limit alternative avenues of communication.

*Renton*, supra at 928-929.

Because Ordinance 97-100 does not ban adult facilities (adult cabarets) altogether, we believe the ordinance is content-neutral and therefore, the proper analysis is one of time, place, and manner regulation. "A city's interest in attempting to preserve the quality of urban life, as here, must be accorded high respect." *Id.* The court further stated that "cities may regulate adult theaters by dispersing them, or by effectively concentrating them, as in Renton." *Id.* at 930-932.

The purpose for enacting Ordinance 97-100 is stated in the preamble to the ordinance, which states: "Whereas, the supervisors deem it to be in the township's best interest regarding the health, welfare and safety of a citizenry; and..." [Plaintiff's exhibit #4-Ordinance 97-100.] Defendant

contends that the township must prove "that the ordinance was primarily motivated by concerns unrelated to the content of the expressive conduct itself." [Defendant's post final hearing memorandum, 9/27/10, p.4.] We believe plaintiff has established that the ordinance was primarily motivated by concerns unrelated to the content of the expressive conduct.

As we pointed out in our prior opinion, plaintiff's ordinance does not seek to ban adult cabarets altogether from the township; it merely seeks to regulate such businesses by dispersing them or concentrating them in the industrial zone. Plaintiff provided ample testimony and evidence in the form of township zoning maps (plaintiff's exhibit no. 7 & 10) to show that it has provided reasonable alternative avenues of communication in the industrial zoning district as required by the first amendment.

Defendant also argues that the ordinance does not pass muster under the intermediate scrutiny test set forth in *United States v. O'Brien*, 391 U.S. 367 (U.S. Sup. Ct. 1968) and instead, argues that the ordinance must "necessarily be subject to strict scrutiny." [Defendant's post final hearing memorandum, 9/27/10, p.9.] We disagree. If any standard applies, it is intermediate scrutiny.

Like the respondent in *Renton*, defendant argues that "Jackson Township has failed to meet its burden of proving the existence of an adequate number of alternative available sites." [Defendant's post final hearing memorandum, 9/27/10, p.11.] Again, we disagree. The majority of the testimony in the final hearing dealt with the availability of alternative available sites for an adult cabaret. Plaintiff presented exhibits and testimony that there are at least 27 sites in the industrial zoning district that provide reasonable

alternative avenues of communication. However, after taking into account the isolation distances as required in section 2 of the ordinance, the number of available lots was reduced to 17. Nevertheless, the engineers who testified on behalf of plaintiff, Andrew Bohl and Charles Unangst, both of Hanover Engineer Associates, indicated that they were not aware of any ordinance features or other physical features regarding these properties that would preclude their use or development as an adult facility.

Defendant argues that "[t]he lack of available commercial financing is particularly acute in this case because the industrial district contains no rental properties, no restaurants, no taverns, no convenience stores and, indeed, no other structures that can readily be converted into use by an adult cabaret. A person who wished to put an adult cabaret in that zone would have to purchase the land, then build, furnish, equip and stock the building before receiving one dime in revenue." [Defendant's post final hearing memorandum, 9/27/10, p.19.] Like defendant, the respondent in *Renton* argued that "in general there are no 'commercially viable' adult theater sites within the limited area of land left open for such theaters by the ordinance." However, the court stated that "the fact that respondents must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a violation of the first amendment, which does not compel the government to ensure that adult theaters, or any other kinds of speech-related businesses, will be able to obtain sites at bargain prices." *Renton*, supra at p. 932.

During the testimony regarding available sites within the industrial zoning district, there was disagreement on how the isolation distances should be measured. Defendant argued

that the isolation distances set forth in the ordinance should be measured property line to property line. However, the zoning officer, Michelle Arner, testified that she measures structure to structure. This argument took up a large amount of the time allotted for the final hearing. Defendant also claims that the ordinance is defective for the following reasons:

a) That the location of the lots which plaintiff indicates are available for an adult cabaret within the industrial zoning district would violate the isolation distances as set forth in Section II of 97-100 above,

b) Defendant argues that the isolation distances from a house of worship, indoor or outdoor recreational facility, private or public school, day care facilities and bus stops should be measured from property line to property line.

Defendant claims that by measuring from "property line to property line", these isolation distances would prohibit use of any of the available lots referenced by plaintiff. We agree. However, the testimony of the township's zoning officer clearly established that for this purpose, the isolation distances would be measured from facility to facility, not property line to property line. When asked what she meant by "facility", Ms. Arner stated that she considers a "facility" a structure. Defendant, on the other hand, believes that the term "facility" also encompasses an outdoor recreational facility (with no structures) and therefore, the isolation distance would have to be measured using the property lines. We do not accept this interpretation.

*The term* "facility" *is defined* as a room, equipment, etc. provided for people to use; something such as a room or piece of equipment that is provided at a place for people to use; a bathroom or toilet; and area or building used for a particular

purpose. Facility may also refer to an installation, contrivance, or other thing which facilitates something; a place for doing something such as a commercial or institutional building. Based on this definition, we believe that the term "facility" can only mean man-made structures; i.e. a church building, park buildings, indoor or outdoor swimming pools, tennis courts, etc.

Defendant argues that Big Pocono State Park, which is located in Pocono Township bordering along Jackson Township's industrial zone, is a "public recreation facility". However, Big Pocono State Park while it is a recreation area open to the public, has no buildings, swimming pools, tennis courts, etc. — no amenities except for hiking trails. Therefore, we find that Big Pocono State Park is not a "facility" as that term is defined above.

Next, defendant argues that the entire property owned and occupied by Streamside Camp is a "house of worship" and thus a "facility" for purposes of measuring isolation distances. While there may be two or three buildings located on the camp property where worship takes place, the camp property itself is not a "facility" i.e. a house of worship, as the term facility is defined above.

Defendant also argues that "[t]he lack of available commercial financing is particularly acute in this case because the industrial district contains no rental properties, no restaurants, no taverns, no convenience stores and, indeed, no other structures that can readily be converted into use by an adult cabaret." Defendant asserts that because of contaminants leaching from the Butz Landfill Superfund Site into and contaminating the groundwater system throughout the industrial zone, commercial financing will be virtually

impossible especially in today's economic climate. Defendant claims that the underground subterranean water has been identified as being polluted thus barring the utilization of terrain above ground in residential and/or commercial applications. Defendant provided no reliable evidence that commercial financing would not be available due to the contamination of subterranean water from the Butz Landfill Superfund Site. The EPA report (defendant's exhibit 24-public health assessment, dated 11/3/09) makes the determination while "[t]he site posed a past public health hazard because people were exposed to contaminated groundwater; [c] urrently, the site represents no public health hazard..." [Website for Agency For Toxic Substances & Disease Registry.] The report went on to say that "several changes in conditions could alter that conclusion" but stated that if certain conditions presently in place continue to be enforced, there should be no public health hazard. [Defendant's exhibit 24-public health assessment, 11/3/09.] Moreover, when the contaminants were discovered, Pocono and Jackson Townships combined their efforts at remediation by creating the Pocono Jackson Township Joint Water Authority. The authority has installed a public water system which services the lots located in the industrial zoning district. Therefore, without actual evidence that commercial financing is not available to an individual or company who seeks to locate in the industrial zone due to this contamination (rather than due to the economic downturn), this argument must fail.

Finally, and arguably important to our decision is the fact that defendant, while arguing that there are no reasonable avenues of communication within the Jackson Township industrial zone, has never applied for a zoning permit, which is a necessary requirement for the change in use from the prior

use of a good/beverage facility to an adult cabaret. Moreover, there is a procedure under the municipalities planning code available to an applicant to make a challenge to the validity of a provision of a zoning ordinance on substantive grounds. This is referred to as the curative amendment procedure and is set forth in 53 P.S. 10609.1 and 10609.2. Defendant has failed to follow the procedures for obtaining a zoning permit and has failed to follow the procedures of the municipalities planning code to obtain a curative amendment.

After considering all of the documentary and testimonial evidence presented by both parties, we make the following determinations:

a)   Thrills is currently located in the commercial zone of Jackson Township;

b)   Dizzy Dottie, LLC, t/a Thrills, is operating its business as an adult cabaret;

c)   Pursuant to the Jackson Township Zoning Ordinance 97-100, an adult cabaret is barred from operating in the commercial zone;

d)   Township has shown that properties are available for such use in the industrial zone of the township;

e)   The evidence establishes that there would be no prohibition by state or federal government agencies that would prohibit utilization of the properties in the industrial zone for a commercial business.

f)   We find no prohibition in Ordinance 97-100 which would bar a would-be entrepreneur from building or converting existing property in the industrial zone for use as an adult cabaret;

g)  The zoning ordinance does not bar the construction of an adult cabaret facility in the industrial zoning district;

h)  We find the evidence presented by township regarding the number of alternate sites in the industrial zone to be credible;

i)  The evidence provides that at least 17 lots are available for that particular purpose;

j)  Therefore, we conclude that Ordinance 97-100 is content-neutral and complies with the first amendment requirements for a time, place and manner restriction. Accordingly, we find that Zoning Ordinance 97-100 is constitutional and will, therefore, be enforced.

*-Petition to enjoin or abate violations of 68 Pa. C.S.A. §§5503(b) & (d)*

On July 20, 2010, plaintiff filed a petition to enjoin or abate violations of 68 Pa. C.S.A. §§ 5503(b) & (d) requesting the court to "enter an order restraining the continuation of any violation or violations pending such next hearing and the court's final decision". If upon conclusion of the final hearing, the court finds that the defendant has heretofore violated chapter 55, then plaintiff asks the court to order that the premises occupied by "Thrills" shall not be occupied or used for any purpose for up to one year following the date of the court's order. [Plaintiff's petition to enjoin or abate violations, 7/20/10, ¶¶17-18. p.5.]

68 Pa. C.S.A. § 5503(b) provides as follows:

Every adult-oriented establishment doing business in this Commonwealth shall be well-lighted at all times and be physically arranged in such a manner that the entire

interior portion of the booths, cubicles, rooms or stalls where adult entertainment is provided shall be clearly visible from the common areas of the premises. Visibility into such booths, cubicles, rooms or stalls shall not be blocked or obscured by doors, curtains, partitions, drapes or any other obstruction whatsoever. It shall be unlawful to install enclosed booths, cubicles, rooms or stalls within adult-oriented establishments for whatever purpose, but especially for the purpose of providing for the secluded viewing of adult-oriented motion pictures or other types of adult-oriented entertainment.

68 Pa. C.S.A. § 5503(d) further provides as follows:

The operator of each adult-oriented establishment shall be responsible for and shall provide that any room or other area used for the purpose of viewing adult-oriented motion pictures or other types of live adult entertainment shall be well-lighted and readily accessible at all times and shall be continuously open to view in its entirety. The premises shall be equipped with overhead lighting fixtures of sufficient intensity to illuminate every place to which patrons are permitted access at an illumination of not less than a one footcandel as measured at the floor level. It shall be the duty of the operator and the operator's agents to ensure that the illumination required by this subsection is maintained at all times that a patron is present in the premises.

"Upon finding that the material allegations of the petition are true, the court shall order that neither the premises nor any part of the premises be used in violation of this chapter." 68 Pa. C.S.A. § 5506(b)(2). If the court orders that a violation be abated, it "may order that neither the premises

nor any part of the premises shall be occupied or used for any purpose for up to one year following the date of the court's order." *Id.* After considering the testimony presented up to July 20, 2010, we determined that "violations of Chapter 55, specifically §§ 5503(b) and (d), have occurred by virtue of female dancers at the 'Thrills' club having engaged in live adult entertainment in upstairs VIP rooms while the interior of the room and the entertainment occurring inside were not clearly visible from the common areas of the premises." [Order, 7/28/10.]

Although evidence was presented that the curtains on the doorways to the VIP rooms have been removed, evidence presented in the form of testimony from the private investigators indicates that even without the curtains, the interior of the VIP rooms still are not visible from the common areas of the establishment. Even the photographs presented by defendant are inconclusive. Those photographs taken from a distance do not show the interior of the rooms and the remaining pictures were obviously taken from the doorway to the rooms. Accordingly, we find that the design and location of the VIP rooms violate the conditions of Chapter 55, specifically §§ 5503(b) and (d). Therefore, plaintiff is entitled to an order against defendant directing that neither the premises nor any part of the premises shall be occupied or used for any purpose for up to one year following the date of the court's order.

*-Petition for supplemental preliminary injunctive relief*

On August 20, 2010, plaintiff filed a petition for supplemental preliminary injunctive relief, seeking a supplemental preliminary injunction directing defendant to cease operations at the Route 715 and Doll Road premises,

pending disposition of the plaintiff's underlying complaint for permanent injunction. Plaintiff's request is based on additional testimony showing a continued violation of the court's preliminary injunction dated June 16, 2010. [Plaintiff's petition for preliminary supplemental injunctive relief, 8/20/10, ¶ 18.]

In *Izenson v. Izenson*, 418 A.2d 445 (Pa. Super. 1980), the Pennsylvania Superior Court stated that "[w]here a preliminary injunction is in force, the issuance of a permanent injunction terminates the preliminary injunction." Because the preliminary injunction issued on June 16, 2010, will cease to be in effect upon the filing of the present opinion and order granting permanent injunction, we cannot grant supplemental preliminary injunctive relief. Accordingly, plaintiff's petition for preliminary supplemental injunctive relief is moot.

## ORDER

And now, October 19, 2010, based on the foregoing, it is ordered as follows:

1. Plaintiff/petitioner, Jackson Township's, complaint seeking permanent injunctive relief against defendant/respondent is granted.

2. Plaintiff/petitioner, Jackson Township's petition to enjoin or abate violations of 68 Pa. C.S.A. §§5503(b) & (d) is granted.

3. Plaintiff/petitioner's petition for supplemental preliminary injunctive relief is moot.

4. Defendant/respondent, Dizzy Dottie, LLC, doing business as Thrills, is permanently enjoined from occupying

or using the commercially zoned premises located at Route 715 and Doll Road as an adult cabaret, which use is permitted only within the industrial zoning district of Jackson Township, Pennsylvania, nor any part of the premises, for any purpose for up to one year following the date of this order.